**WISCONSIN WINNEBAGO BUSINESS COMMITTEE, Plaintiff-Appellee, Cross-Appellant,**

v.

**John P. KOBERSTEIN & Ho-Chunk Management Corporation, Defendants-Appellants, Cross-Appellees.**

Nos. 84–1768, 84–1863.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 29, 1985.

Decided May 29, 1985.

Douglas B.L. Endreson, Sonosky, Chambers, Sachse & Guido, Washington, D.C., for Wis. Winnebago Business.

John P. Koberstein, Madison, Wis., pro se.

Before BAUER, COFFEY, and FLAUM, Circuit Judges.

COFFEY, Circuit Judge.

The defendants, John P. Koberstein and the Ho-Chunk Management Corporation,[1] appeal the determination of the district court that its Bingo Management Agreement with the Wisconsin Winnebago Business Committee is null and void under 25 U.S.C. § 81. We affirm.

## I.

On July 9, 1983, the Wisconsin Winnebago Business Committee ("Business Committee"), the governing body of the federally recognized Wisconsin Winnebago Tribe ("Tribe"), hired Koberstein, the defendant, as its tribal attorney. At Koberstein's suggestion, the Tribe entered into a Bingo Management Agreement ("Agreement") with the co-defendant, the Ho-Chunk Management Corporation ("Ho-Chunk"), providing that Ho-Chunk would construct and manage a tribal bingo hall located near Lake Delton, Wisconsin. Koberstein is the president of the Ho-Chunk Management Corporation. Under the terms of the Agreement, Ho-Chunk was to receive $27,000 for preparing a proposal to be presented to the federal Department of Housing and Urban Development for federal funds and for supervising the construction of the hall. Ho-Chunk also was engaged under the terms of the contract for a five-year period "commencing the first day of operation of the Bingo Hall, to assist the [Business Committee] in obtaining financing, construct, improve, develope [sic], manage, operate and maintain the Property as a facility for the conduct of bingo games...." The Agreement granted Ho-Chunk the exclusive right to "operate and maintain the Property" as a tribal bingo hall and to control "all business and affairs in connection with the operation, management and maintenance of the Property." Furthermore, the Business Committee

---

**1.** For convenience, the defendants will be referred to collectively as "Ho-Chunk."

"specifically warrant[ed] and represent[ed] to [Ho-Chunk] that [the Business Committee] shall not act in any way whatsoever, either directly or indirectly, to cause this Management Agreement to be altered, amended, modified, canceled, terminated and/or attempt to assign or transfer this Management Agreement or any right to or interest in said Agreement. Further, [the Business Committee] warrant[ed] and represent[ed] that it shall take all actions necessary to ensure that the Management Agreement shall remain in good standing at all times."

The Agreement recited a legal description of the Property, located on tribal trust land, and allowed Ho-Chunk to record the Agreement "in any Public Record." Furthermore, the Agreement provided that the Business Committee "shall not act in any way whatsoever, either directly or indirectly to cause any party to become an encumbrancer of the Property subject to this Agreement without the prior written consent of [Ho-Chunk]." In return for providing management services, Ho-Chunk was to receive "25 percent of net operating profits for each fiscal year resulting from and in connection with any business activities upon the Property."

On August 23, 1983, Ho-Chunk submitted the Agreement and the Wisconsin Winnebago Business Committee resolution adopting the Agreement to the Bureau of Indian Affairs ("BIA") for approval under 25 U.S.C. § 81. 25 U.S.C. § 81 provides in relevant part:

"No agreement shall be made by any person with any tribe of Indians, or individual Indians not citizens of the United States, for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him, or any other person in consideration of services for said Indians relative to

their lands, or to any claims growing out of, or in reference to, annuities, installments, or other monies, claims, demands, or thing, under laws or treaties with the United States, or official acts of any officers thereof, or in any way connected with or due from the United States, unless such contract or agreement be executed and approved as follows:

\*    \*    \*    \*    \*    \*

"(2) It shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs endorsed upon it.

\*    \*    \*    \*    \*    \*

"All contracts or agreements made in violation of this section shall be null and void."

Sometime during the second week of November, 1983, the Minnesota Area Office of the BIA requested an opinion from the Department of Interior's Office of the Field Solicitor concerning the Agreement.[2] On November 16, 1983, the Field Solicitor's Office advised the BIA that the Department of the Interior's approval was required only of contracts in which a "tribe purports to pay 'money or other thing of value' when such money or thing derives from amounts due to the tribe from the United States or is trust property or proceeds from trust property." Although the Field Solicitor found "[t]here is no doubt that the Agreement is related to lands of the Wisconsin Winnebago Tribe," section 81 did not apply because the funds Ho-Chunk was to receive were not "trust funds or proceeds of trust property." Ho-Chunk was not formally notified of this decision until February 28, 1984.

Sometime during the late summer or early fall of 1983, the Ho-Chunk Management Corporation directed that the construction of the Bingo Hall proceed even though it had not received a response from the BIA.

**2.** "The Office of the Solicitor performs all of the legal work of the Department [of the Interior] with the exception of that performed by the Office of Hearings and Appeals and the Office of Congressional and Legislative Affairs.... The Division of Indian Affairs [of the Office

of the Solicitor] is responsible for legal matters involving the programs of the Assistant Secretary—Indian Affairs and the Bureau of Indian Affairs."
The United States Government Manual, Office of the Federal Register (1984–85).

On November 12, 1983, the same day that the Bingo Hall opened, the Business Committee voted to rescind the Agreement with Ho-Chunk. Some two weeks thereafter, on November 27, 1983, the Business Committee enacted an ordinance regulating bingo on tribal lands providing *inter alia* "No person shall engage in the operation of bingo games on Wisconsin Winnebago trust lands, unless duly licensed or permitted to do so by the Wisconsin Winnebago Tribe in accordance with the terms of this ordinance."[3] Even though the Bingo Management Agreement had been rescinded, Ho-Chunk, which had not applied to the Winnebago tribe for a bingo license, continued to operate the bingo enterprise.

On December 8, 1983, the Business Committee filed suit in the United States District Court for the Western District of Wisconsin to enjoin Ho-Chunk from operating bingo games on tribal trust lands on the Winnebago Reservation. The Business Committee alleged that the Agreement between Ho-Chunk and the Business Committee was void under 25 U.S.C. § 81, and alternatively that Ho-Chunk's bingo operation violated the Tribe's Bingo Ordinance. Subsequently, the Business Committee moved for summary judgment. On April 2, 1984, the district court granted summary judgment holding that the Agreement was null and void since it had not been approved by the Department of Interior as required by 25 U.S.C. § 81. Because the court "believe[d] that equity demands that defendants be given a period of time to cure the defect which mandated summary judgment against them or to resolve its responsibilities in an orderly fashion," it declared that the Agreement would become null and void effective June 30, 1984.[4] Additionally, the district court found that the bingo ordinance "left the WWBC in the position to exercise absolute discretion as to whether Ho-Chunk would be allowed to operate a bingo game. There is little doubt, under the facts in this case, that the WWBC would exercise its discretion against Ho-Chunk." The Court concluded that it could "see no reason why the bingo ordinance adopted by the tribe, respecting the manner of operation, and to the extent not specifically in conflict with contract provisions, cannot be given immediate implementation. However, the requirement that Ho-Chunk be licensed is directly contrary to the powers granted Ho-Chunk in the contract." The parties raise three issues on appeal: (1) whether the Bingo

**3.** "'Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory'.... The sovereignty retained by tribes includes 'the power of regulating their internal and social relations.'" *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 103 S.Ct. 2378, 2385, 76 L.Ed.2d 611 (1983) *quoting White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) and *United States v. Kagama,* 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886). The Wisconsin Winnebago Tribe rather than the State of Wisconsin regulates bingo games conducted by the tribe on the Winnebago reservation because Wisconsin's bingo law, a civil regulation, is inapplicable to games conducted on Indian reservations. *Oneida Tribe of Indians of Wis. v. State of Wis.,* 518 F.Supp. 712 (W.D.Wis. 1981). *See also Barona Group v. Duffy,* 694 F.2d 1185 (9th Cir.1982) (California law regulating bingo games inapplicable to bingo games conducted on the Barona Tribe's reservation because the state law was civil and regulatory rather than criminal and prohibitive in nature); *Seminole Tribe v. Butterworth,* 658 F.2d 310 (5th Cir.1981) (Florida law regulating bingo games inapplicable to bingo games conducted on the Seminole Tribe's reservation because the state law was civil and regulatory rather than criminal and prohibitive in nature.)

**4.** On April 10, 1984, Ho-Chunk resubmitted the Agreement to the BIA for approval. The Director of the BIA's Minnesota Area Office found that tribal control over trust lands, tribal self-government and tribal economic development were jeopardized because the Agreement gave inequitable financial advantages and excessive control over the bingo operations to the defendants. Furthermore, the Area Director determined that "by his failure to disclose the [potential conflict of interest between his duties as tribal attorney and his position as president of Ho-Chunk] prior to the execution of the Agreement, ... Mr. Koberstein took unfair advantage of the Tribe at a time when it was most susceptible to his influence." The Area Director of the BIA Minnesota Area Office disapproved the Agreement. The Area Director's disapproval of the Agreement was affirmed by the Interior Department's Deputy Assistant Secretary-Indian Affairs on September 11, 1984.

Management Agreement must be submitted for approval to the Secretary of the Interior pursuant to 25 U.S.C. § 81; (2) whether the Ho-Chunk Management Corporation relied on the Field Solicitor's opinion that § 81 did not apply to the Bingo Management Agreement; and (3) whether the Bingo Management Agreement could bar application of the tribal licensing ordinance to Ho-Chunk.

## II.

### A. Applicability of Section 81.

Ho-Chunk argues that the question of whether a contract is "relative to Indian lands" is irrelevant when determining whether section 81 requires Interior Department approval of a contract with Indian tribes. According to Ho-Chunk, the only relevant inquiry is whether "the tribe purports to pay 'money or other thing of value' when such money or thing derives from amounts due to the tribe from the United States or is trust property or proceeds from trust property." Section 81 was enacted in 1872 "to protect the Indians from improvident and unconscionable contracts...." *In re Sanborn*, 148 U.S. 222, 227, 13 S.Ct. 577, 579, 37 L.Ed. 429 (1893). No federal cases have been presented to us nor have we been able to discover any federal case law that comprehensively analyzes the scope of coverage of section 81. Moreover the Supreme Court cases that do address the scope of section 81 in a cursory fashion do not present a detailed explanation of why the statute applied and are quite ancient. In *Green v. Menominee Tribe*, 233 U.S. 558, 34 S.Ct. 706, 58 L.Ed. 1093 (1914), the Supreme Court held that an oral contract between an Indian tribe and a trader for supplies to be used in logging Indian land was

> "so clearly within the text of the statute that it suffices to direct attention to such text without going further. But if it be conceded for argument's sake that there is ambiguity involved in determining from the text whether the statute is applicable, we are of the opinion that the case made is so within the spirit of the

statute and so exemplifies the wrong which it was intended to prevent and the evils which it was intended to remedy as to disspell any doubt otherwise engendered."

*Id.* at 569, 34 S.Ct. at 710. In *Pueblo of Santa Rosa v. Fall*, 273 U.S. 315, 47 S.Ct. 361, 71 L.Ed. 658 (1927), the Supreme Court held that a contract by a tribal chief agreeing that an attorney should represent the tribe in its claim "to an enormous tract of country" for a fee of one-half interest in the tract was "void by force of § 2103 [now § 81] and § 2116 [now § 177] of Title 25...." *Id.* at 320, 47 S.Ct. at 362. Ho-Chunk distinguishes these decisions by arguing that they were rendered at a time when Indians were more in need of the protection of the statutes and at a time prior to the present federal policy favoring tribal self-determination. Ho-Chunk urges us to consider intervening acts of Congress and to consult present federal Indian policy for guidance in construing section 81. According to Ho-Chunk, present federal Indian policy strongly promotes tribal self-determination and tribal capacity to deal effectively in the business world. Furthermore, the defendant argues that Congress has taken explicit action where it believed necessary to protect Indian property interests. Ho-Chunk concludes that requiring Interior Department approval of contracts "relative to their land" would "create a situation in which both the tribal entity and any outside contractor dealing with the tribe would operate in an atmosphere of complete uncertainty."

Initially, we note that the defendants have failed to cite a case holding that when construing Indian statutes, the courts are "guided" by intervening acts of Congress and current federal Indian policy. The rule enunciated by the Supreme Court is that, "[u]ntil Congress repeals or amends the Indian ... statutes ... we must give them 'a sweep as broad as their language' and interpret them *in light of the Congress that enacted them*." *Central Machinery Co. v. Arizona State Tax Com'n*, 448 U.S. 160, 166, 100 S.Ct. 2592, 2596, 65 L.Ed.2d

684 (1980) (citations omitted) (emphasis added) (Indian Trader Statutes).

" 'Indian law' draws principally upon the treaty drawn and executed by the Executive Branch and legislation passed by Congress. These instruments, which beyond their actual text form the backdrop for the intricate web of judicially made Indian law, cannot be interpreted in isolation but *must be read in light of the common notions of the day and the assumptions of those who drafted them.*"

*Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 206, 98 S.Ct. 1011, 1019, 55 L.Ed.2d 209 (1978) (jurisdiction of Indian tribal courts) (emphasis added). Our inquiry when determining the effect of intervening acts of Congress on Indian statutes is whether the Indian statute has been repealed by implication. *See Morton v. Mancari,* 417 U.S. 535, 546, 94 S.Ct. 2474, 2480, 41 L.Ed.2d 290 (1974) (effect of the Equal Employment Opportunities Act of 1972 on the Indian Reorganization Act of 1934); *United States v. Crawford,* 47 Fed. 561, 569 (1891) (section 81 impliedly repealed by statutes specifically dealing with the sale of Oklahoma). "Repeals by implication are not favored." *Mancari,* 417 U.S. at 549, 94 S.Ct. at 2482. "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Id.* at 550. Absent a clear and manifest legislative intent to repeal a statute, apparently conflicting statutes must be read to give effect to each if such can be done by preserving their sense and purpose. *Watt v. Alaska,* 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981). If a later act covers the whole subject matter of an earlier act and embraces new provisions which

plainly show that the later act was intended as a substitute for the earlier act, the later act will operate as a repeal of the earlier act. *Crawford,* 47 Fed. at 569. It is obvious from the broad language "relative to their lands" that Congress intended to cover almost all land transactions in Indian property. This literal reading of the statute is supported by the history of Federal regulation of Indian lands. Before independence, colonial legislatures safeguarded the Crown's right to negotiate exclusively with the Indian tribes for the extinguishment of their aboriginal title by restraining private land purchases from the Indians and by requiring all acquisitions of Indian land to be licensed or approved in advance by the colonial authorities. F. Cohen, Handbook of Indian Law, 508 (1982 ed.). After the War of Independence, the Federal government continued the policy of restraining alienation of Indian land in order to avoid war with the Indian tribes. *Id.* at 508–09. Because of this longstanding policy of regulating all transactions in Indian land, we find no reason to disregard the plain language of the statute and hold that Congress intended to continue its policy of regulating all transactions in Indian land when it enacted § 81 in 1872. Indeed, Congress continues to regulate transactions in Indian land to insulate Indian lands from the full impact of market forces and to preserve the Indian land base for the furtherance of Indian values. *Id.* at 509. Specifically, Congress has passed a number of statutes requiring the Department of Interior's approval of Indian land transactions, including leases, mineral agreements and mortgages.[5] However, in arguing that § 81 has been impliedly repealed, Ho-Chunk does not contend that Congress has passed statutes subsequent to § 81 specifically regulating every conceivable form of

---

**5.** *See, e.g.,* 25 U.S.C. § 311 (public highways); §§ 312–318 (railroad, telegraph, telephone line rights-of-way, and town site stations); § 319 (telephone and telegraph rights-of-way); § 320 (railway reservoirs or materials); § 321 (pipeline rights-of-way); § 323 (rights-of-way for any purpose); §§ 396a–396g (leases for oil and gas mining and permits to prospect); § 399 (leases for mining purposes); § 407 (sale of dead and fallen timber); § 415 (leases of tribal land for public, religious, educational, recreational, residential or business purposes); §§ 416–416j (leases on Sand Xavier and Salt River Reservations); §§ 641–646 (authorizing Hopi Tribal Council to mortgage Hopi land for industrial park); 25 U.S.C. §§ 2101–2108 (mineral agreements).

transaction relative to Indian land. As we previously stated, the Supreme Court has held that Indian statutes must be construed in light of the Congress that enacted the statutes; holding that a particular statute has been repealed "by implication" is disfavored by our courts. Thus, a party seeking to make such a showing must demonstrate that the statute has been effectively amended or repealed by subsequent acts of Congress affecting the conduct covered by the statute's original terms. Ho-Chunk has not presented any evidence that Congress has passed legislation affecting the broad coverage of 25 U.S.C. § 81 and its application to the facts of this case. Thus, because the later acts of Congress do not cover the entire subject matter of § 81, we are convinced the later acts of Congress pertaining to Indian land transactions did not impliedly repeal § 81. Because subsequent acts of Congress have not covered the whole subject matter of the "relative to their lands" provision of section 81, we hold that section 81 governs transactions relative to Indian land for which Congress has not passed a specific statute.

■ Our second inquiry is whether the Bingo Management Agreement is an "agreement ... relative to [Indian] land." The bingo facility, located near Lake Delton, Wisconsin is situated on tribal trust lands that have been proclaimed and designated by Congress as part of the Wisconsin Winnebago Indian Reservation. The Agreement granted Ho-Chunk the exclusive right to "operate and maintain the Property as a tribal bingo hall and to control "all business, management and maintenance of the Property." Furthermore, Ho-Chunk was allowed to record the Agreement "in any Public Record" and the Business Committee was prohibited from "caus[ing] any party to become an encumbrancer of the Property subject to this Agreement without the prior written con-

sent of [Ho-Chunk]." Because the Agreement gives Ho-Chunk the absolute right to control the operation of the bingo facility located on tribal trust lands and prohibits the exercise of the Business Committee's right to encumber tribal trust property, we hold that the Bingo Management Agreement is an "agreement ... relative to [Indian] land," as that term is used in 25 U.S.C. § 81. *Cf.,* Contracts for the Employment of Managers of Indian Tribal Enterprises, 61 Op. Solicitor, Dept. of Interior, No. M–36119 (Feb. 14, 1952) (contract to operate a tribal farming enterprise, including the cultivation of tribal lands, the development of livestock industries to utilize the crops raised by the enterprise, and the marketing of surplus crops is relative to Indian lands as that term is used in § 81).

■ Our final inquiry is whether section 81 applies to the Bingo Management Agreement. As we held above, unless Congress has passed a statute specifically regulating the transaction in question, § 81 applies to Indian land transactions concerning their tribal trust property. Ho-Chunk has failed to produce, and our research has failed to reveal, a statute governing a management contract of the nature of the Bingo Management Agreement.[6] Because in our research we have been able to discover no statute expressly regulating management contracts such as this agreement to manage a bingo facility located on tribal trust lands, we hold that it is the intent of Congress that § 81 govern this transaction. We therefore affirm the judgment of the district court finding the contract null and void as of June 30, 1984 for failure to gain the approval of the Department of the Interior.

## B. Estoppel.

■ Ho-Chunk argues that it justifiably relied on the representations of the Depart-

---

**6.** On November 18, 1983, a bill was introduced in the United States House of Representatives which would regulate bingo management agreements. The bill provided that, "subject to the approval of the Secretary, a tribe may enter into a management contract for the operation and management of a tribal gambling enterprise for a reasonable fee which shall not be based upon any percentage of the gross or net revenue from operation...." H.R. 4566, 98th Cong., 1st Sess. (1983). The bill died in committee but has been reintroduced. H.R. 1920, 99th Cong., 1st Sess. (1985); S. 902, 99th Cong., 1st Sess. (1985).

ment of Interior's Field Solicitor Office that approval of the Bingo Management Agreement by the Department of the Interior was not required under section 81 and that "it is grossly inequitable for the district court to now order that the Department must approve the contract after the WWBC has since taken a position in opposition to the contract." To establish an estoppel, "the party claiming the estoppel must have relied on its adversary's conduct 'in such a manner as to change his position for the worse' and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Heckler v. Community Health Services of Crawford,* —— U.S. ——, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984). The party claiming the estoppel must demonstrate that its reliance caused it to lose "[a] legal right, either vested or contingent, or suffer [an] adverse change in its status." *Id.* 104 S.Ct. at 2225. In *Community Health Services,* the Supreme Court declined to decide whether "estoppel may not in any circumstance run against the Government" because the private party litigant was unable to demonstrate the presence of the judicial element of an estoppel. *Id.,* 104 S.Ct. at 2224–25. In the case at hand, we need not decide whether the Government can under any circumstances be estopped because examination of the facts presented to the district court reveals that the traditional elements of an estoppel are not present. "To analyze the nature of a private party's detrimental change in position, we must identify the manner in which reliance on the Govern-

ment's misconduct has caused the private citizen to change his position for the worse." *Id.* at 2224–25. The Field Solicitor's letter to the Area Director of the Minnesota Area Office of BIA stating that section 81 did not apply to the Bingo Management Agreement was dated November 16, 1983, four days after the Bingo Hall opened for business.[7] Because the government did not act before the Bingo Hall was opened, Ho-Chunk cannot assert that it relied on the Field Solicitor's opinion when it opened the Bingo Hall. To the contrary, Ho-Chunk relied on its unilateral expectation that the contract would be approved by the Department of Interior. Furthermore, Ho-Chunk fails to specify any action it took after learning of the Field Solicitor's Opinion in reliance on that opinion. Because Ho-Chunk fails to establish the traditional elements of an estoppel —specifically, because Ho-Chunk fails to set forth any action taken by Ho-Chunk in reliance on the government's conduct to Ho-Chunk's detriment—we hold that the government is not estopped by the Field Solicitor's opinion that § 81 did not apply to the Bingo Management Agreement.

### C. Bingo Ordinance.

■ The last issue presented for our consideration is whether the Bingo Ordinance was an exercise of the tribal governing body's authority to regulate activities in the interest of the tribe's health and welfare thus overriding any rights granted to Ho-Chunk under the contract. The district court found that the Bingo Ordinance "left the WWBC in the position to exercise absolute discretion as to whether Ho-Chunk

---

7. In an affidavit dated January 23, 1984, Kurt V. Blue Dog, an attorney for the defendants, stated "that in the course of my representation of these parties, I inquired by telephone with the Field Solicitor for the Department of Interior for this area, Mr. Mark Anderson, as to why the Department of Interior had not taken formal action on the Ho-Chunk Management Contract with the Wisconsin Winnebago Business Committee signed and enacted on July 9, 1983. Mr. Anderson, on January 20, 1984, informed me in no uncertain terms that Secretarial approval under 25 U.S.C. § 81 or otherwise, was not required in this instance, and that he had so informed the

Bureau of Indian Affairs." Although Ho-Chunk may have learned of the Field Solicitor's opinion that section 81 did not apply to the Bingo Management Agreement on January 20, 1984 rather than November 16, 1983, this would not change our analysis because in either case, Ho-Chunk learned of the Field Solicitor's opinion *after* it opened the Bingo Hall. Because Ho-Chunk learned of the government's position on the applicability of § 81 after it opened the Bingo Hall, it cannot argue that it relied on the Field Solicitor's opinion before it opened the Bingo Hall.

would be allowed to operate a bingo game. There is little doubt, under the facts in this case, that the WWBC would exercise its discretion against Ho-Chunk." Thus, the specific harm to the Ho-Chunk Management Corporation advanced by the defendants was the possibility that the Business Committee would deprive it of its contract rights by refusing to grant Ho-Chunk a bingo license. "Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." *Iron Arrow Honor Society v. Heckler,* 464 U.S. 67, 104 S.Ct. 373, 374, 78 L.Ed.2d 58 (1983). "[M]ootness has two aspects: 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" *United States Parole Com'n. v. Geraghty,* 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980); *Davis v. Ball Memorial Hosp. Ass'n., Inc.,* 753 F.2d 1410, 1416 (7th Cir.1985). Mootness has been defined as "the doctrine of standing set in a timeframe: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence." *Geraghty,* 445 U.S. at 397, 100 S.Ct. at 1209. At the initiation of this litigation, Ho-Chunk's "personal interest" in the validity of the bingo ordinance was grounded upon its fear that the Business Committee would deprive it of its rights under the Bingo Management Agreement by refusing to grant it a bingo license. We affirm the district court's judgment that the Bingo Management Agreement was null and void as of June 30, 1984 because it had not been approved by the Department of Interior as required by 28 U.S.C. § 81. Ho-Chunk failed to obtain contract rights because of its failure to receive approval of the Bingo Management Agreement from the Department of Interior. Because Ho-Chunk's Bingo Management Agreement with the Business Committee is null and void, it may no longer argue that the Business Committee may possibly deprive it of its rights under the Agreement by refusing to grant it a bingo license. Thus, Ho-Chunk, whose contract is null and void and without legal effect, fails to assert a personal interest in the question of whether the Tribe's Bingo Ordinance would override previously existing contract rights. Since Ho-Chunk's "personal interest" no longer exists, i.e., the fear that the Business Committee would deprive it of its contract rights by refusing to grant it a bingo license, the question of whether the Bingo Ordinance could override the rights granted to Ho-Chunk under the Bingo Management Agreement is moot.

We AFFIRM the judgment of the district court.