# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-3615

_____

United States ex rel. John Yellow    *
Bird Steele,    *

   *

       Appellant,    *

   *    Appeal from the United States

      v.    *    District Court for the District

   *    of South Dakota.

Turn Key Gaming, Inc.; Wayne Barber,    *

   *

       Appellees.    *

   *

_____

Submitted:  June 14, 2001

Filed:  August 16, 2001

_____

Before MAGILL, BEAM, AND HAMILTON,[1] Circuit Judges.

_____

BEAM, Circuit Judge.

The United States and its relator, John Yellow Bird Steele (collectively "the United States"), appeal an adverse grant of summary judgment. We affirm, but on different grounds than those established by the district court.

_____

[1]The Honorable Clyde H. Hamilton, United States Circuit Judge for the Fourth Circuit, sitting by designation.

## I.

The relevant facts are largely undisputed. On January 19, 1995, the Oglala Sioux Tribe (the "Tribe") entered into a contract entitled Prairie Wind Casino Rental Agreement ("Rental Agreement") with Turn Key Gaming, Inc. On the same date, the Tribe entered into another contract entitled Prairie Wind Casino Employment Agreement ("Employment Agreement") with Wayne Barber. (Both agreements together hereinafter referred to as the "Agreements").

Under the Rental Agreement, the Tribe agreed to pay Turn Key $100,000 per month for the lease of three modular, movable buildings and their assorted plumbing, trim and other fixtures, gaming equipment, tables and accessories, money counting equipment, snack bar facilities, office furniture, outdoor lighting, a security system and a pick-up truck. The Rental Agreement additionally included sitework to be performed by Turn Key, including the installation of a sewer system, road grading and landscaping. The Rental Agreement additionally included consideration for six months of site preparation previously undertaken by Turn Key.

Under the Employment Agreement, the Tribe hired Wayne Barber, the President of Turn Key Gaming, at a salary of $2000 every two weeks, as an employee to "supervise, oversee and operate under direction and control of the Oglala Sioux Tribe," the Prairie Wind Casino. The Employment Agreement placed Barber under the "direct supervision of" and required him to "report directly to the Executive Director of the Tribe." It also required Barber to keep the land and buildings free of all encumbrances. The Employment Agreement required the signature of the Tribal Treasurer on all casino accounts. It also required tribal approval for all payments in excess of $5000, and retained a right of access to all records and accounts.

Federal law, 25 U.S.C. § 81 ("Section 81"), requires various types of agreements with Indian tribes to be authorized by certain designated federal officials. Accordingly,

the parties had the Rental and Employment Agreements authorized by Delbert Brewer, then superintendent of the Pine Ridge Agency. The parties agree that superintendents are not among those officials designated to authorize contracts requiring Section 81 approval.

Both Agreements terminated by their own terms on December 7, 1995, when the National Indian Gaming Commission approved a permanent management agreement. Prior to that date, though, the Tribe paid Turn Key $1,313,151 under the Rental Agreement, and paid Barber $46,200 under the Employment Agreement.

The United States, through its relator, John Yellow Bird Steele, filed this qui tam action pursuant to 25 U.S.C. § 81[2] in order to recover those payments, which the United States characterizes as illegal. The United States argued that Section 81, through 25 U.S.C. § 1, sets strict limits on who may authorize an agreement with an Indian tribe. As the Agreements were not authorized by a duly empowered individual, the United States continued, the Agreements were void *ab initio*. The district court disagreed. Looking at the parties' course of conduct, and evidence that Superintendent Brewer apparently received authorization to sign the Agreements, the district court concluded that principles of agency and equity permitted enforcement of the Rental and Employment Agreements. Given its conclusion that the Agreements were properly authorized, the district court declined to address whether the Agreements actually required Section 81 approval.

The United States now reasserts its Section 81 argument and challenges equity and agency as sufficient bases to overcome its strictures. The appellees dispute the United States' characterization of Section 81, and also argue that the Agreements are not subject to its requirements. Because we agree with this latter contention, we affirm.

---

[2]In March 2000, Congress amended 25 U.S.C. § 81 to remove its qui tam provisions. This suit, however, was filed under the unamended statute.

## II.

Section 81 governs all contracts with an Indian tribe whereby the tribe trades consideration for "services for said Indians relative to their lands." 25 U.S.C. § 81. All such agreements must "bear the approval of the Secretary of the Interior and the Commissioner of Indian affairs indorsed upon [them]." Id. Any agreement subject to Section 81, but not so indorsed, "shall be null and void, and all money or other thing of value paid to any person by any Indian or tribe . . . may be recovered by suit in the name of the United States." Id. For our purposes, in order to be subject to Section 81, the Agreements must be both (1) for services and (2) relative to Indian lands.

### *Contracts for "Services"*

Starting with the "for services" requirement, we immediately run into a bit of an historical oddity. In Green v. Menominee Tribe, 233 U.S. 558 (1914), the Supreme Court applied Section 81 to an oral contract for the provision of logging equipment and supplies to an Indian tribe. The tribe, or its members, destitute and facing starvation, allegedly gave oral consent to a deal whereby traders would supply equipment and supplies and the tribe would conduct logging operations, the results of which would be marketed by an Indian agent who in turn would repay the traders and also remit some portion of the proceeds to the tribe. When the agent failed to repay a trader, he sought payment from the tribe. Id. at 563-66. Turning to Section 81, the Court held "we think . . . this subject is so clearly within the text of the statute that it suffices to direct attention to such text without going further." Id. at 569.

The problem, of course, is that a contract for goods such as provided by the trader, as opposed to services, quite clearly falls outside the statute's strictures. The Court failed to analyze the text of the statute, but did discuss the equities of the case.

[I]f it be conceded for argument's sake that there is ambiguity involved in determining from the text whether the statute is applicable, we are of the opinion that the case as made is so within the spirit of the statute and so exemplifies the wrong which it was intended to prevent and the evils which it was intended to remedy as to dispel any doubt otherwise engendered.

Id. The Court noted that the nature of the alleged oral contract shifted several times in the courts below. Id. at 569-70. Moreover, the case was really about "upon whom the loss must fall resulting from the failure of the person designated under the asserted contract and who received the money, to discharge his duty by paying it over," and judgment against the tribe would have required them to pay twice for the same goods. Id. at 570-71.

Green stands squarely at odds with our own holding in United States ex rel. Harlan v. Bacon, 21 F.3d 209 (8th Cir. 1994), where we reviewed a sharecrop agreement between a farmer and the Omaha Indian Tribe, whereby the tribe permitted use of the land in return for forty percent of the produce. Id. at 210. The tribe sought to avoid the contract on the grounds asserted here–that the contract was not properly authorized. Without discussing or citing Green, we held that the contract required no such authorization because the tribe exchanged use of the land not for services, but for crops. We found Congress' use of the word "services" quite deliberate–contracts for goods, as opposed to contracts for services, are not covered by Section 81.

We are thus caught between the clear text of the statute and our own plain reading of it in Bacon on the one hand, and the Supreme Court's application of the statute in Green on the other. Were we to apply Green's equity-based reasoning here, we might conclude that, unlike Green, this situation is one with which Congress was not concerned. For here the Tribe negotiated written contracts, seemingly in good faith, and likely with competent counsel, and now it is the Tribe which is trying to escape that obligation on a technicality. See United States ex rel. Steele v. Turn Key Gaming, Inc.,

135 F.3d 1249, 1252 (8th Cir. 1998) (noting during prior appeal of this case that the Tribe "unequivocally agrees with Steele that the temporary contracts are invalid"). But we think such a course improper. But see Sac & Fox Tribe of Indians of Oklahoma v. Apex Const. Co., Inc., 757 F.2d 221, 222 (10th Cir. 1985) (affirming on other grounds district court ruling that Section 81 applies only to cases where tribe requires protection from skullduggery).

Rather, we think the better approach is to read Green as creating a remedy for the specific problem before the Court at that time. The Supreme Court had long concerned itself with broad application of the Indian statutes in order to afford the tribes the full protection of the laws against unscrupulous outsiders. See Pueblo of Santa Rosa v. Fall, 273 U.S. 315, 319-20 (1927) (Section 81 protects Indians "unlettered and under national wardship"); In re Sanborn, 148 U.S. 222, 227 (1893) (Section 81 intended to "protect the Indians from improvident and unconscionable contracts"); see also Felix v. Patrick, 145 U.S. 317, 330 (1892) (Indians are "wards of the nation, entitled to a special protection in its courts, and as persons 'in a state of pupilage'"); Pickering v. Lomax, 145 U.S. 310, 316 (1892) (purpose of precursor statute was to "protect the Indian against the improvident disposition of his property"). We think Green flowed naturally with these sentiments and protected a tribe against a gross injustice, but its approach has less relevance to the case before us today.[3] Accordingly, we follow our own more recent rule, established in Bacon, that Section 81 applies only to contracts for services, and not those for goods.

---

[3]Other recent authorities addressing Section 81 support this approach. See Wisconsin Winnebago Bus. Comm. v. Koberstein, 762 F.2d 613, 617 (7th Cir. 1985) (referring to Green as "ancient" and lacking in explanation); In re United States ex rel. Hall, 825 F. Supp. 1422, 1432 (D. Minn. 1993) (same), aff'd mem., 27 F.3d 572 (8th Cir. 1994). Also, the United States does not rely on Green in the matter before us.

This conclusion settles the issue as to the bulk of the Rental Agreement, which largely governs the Tribe's rental of equipment–modular buildings, gaming tables and such. These are clearly goods, and not services, and thus do not require Section 81 approval. This does not dispose entirely of the Rental Agreement, however, because it also contemplates Turn Key's provision of some services including grading, landscaping and sewer installation. These, along with the Employment Agreement, require additional analysis under the remaining statutory criterion.

### *Relative to Indian Lands*

Section 81 requires approval only of contracts providing services to Indians "relative to their lands." 25 U.S.C. § 81. The problem with this language, however, is that the term "relative" is itself relative. The phrase does not lend itself to easy construction. Indeed, it could be construed so narrowly as to apply only to contracts transferring title to parcels of land. Conversely, it might be read so broadly as to require federal approval of every contract for services signed or negotiated on or even near Indian land. In this case, we are petitioned to apply it to agreements for sitework and employment services. Were we to do so, would it then also apply to a tribe's contract with a custodian in its administrative offices? Or would such a conclusion require every tribal member who wants a driveway repaved to get federal approval before hiring a contractor?[4] The questions raised by the statute are increasingly varied. Should this statute void warranties, implied or otherwise, not expressly authorized? Should it undermine contracts implied in fact or in law? And how would it apply to a

---

[4]In Sac & Fox Tribe, the Tenth Circuit held Section 81 had no application to a contract to construct a museum and cultural center with funds appropriated from the Economic Development Administration, an exception the plain language of the statute certainly does not create. 757 F.2d at 221-22.

contract regarding land the tribe has not yet purchased but intends to purchase?[5] The statute's language betrays little by way of an answer.

The Supreme Court's efforts applying Section 81 are not particularly instructive. As discussed above, Green is quite unavailing. And in the only other case in which the Court applied Section 81, the contract so clearly fell within the statute as to require little by way of discussion. See Pueblo of Santa Rosa, 273 U.S. at 316-17 (invalidating a land transfer and power of attorney authorizing the grantee to sue to establish Indian rights over the land for failure to properly obtain Section 81 approval).

The legislative history provides some insight into the intent behind Section 81. See Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 572 (1982) (reviewing legislative history to assist statutory interpretation). The law's supporters were particularly concerned with claims agents and attorneys working on contingency fees who routinely swindled Indians out of their land, accepting it as payment for prosecuting dubious claims against the federal government. See Cong. Globe, 41st Cong., 3d Sess. 1483, 1483-87 (daily ed. Feb 22, 1871);[6] accord Penobscot Indian

---

[5]The First Circuit took up this question in Penobscot Indian Nation v. Key Bank of Maine, 112 F.3d 538 (1st Cir. 1997), where it concluded that Section 81 had application only to Indian Trust lands, and not to all land after-acquired by a tribe or a single member. This issue not being before us we express no opinion thereupon.

[6]For instance, supporters of the act argued:

This is to protect the Indians against claims agents, who present and secure the payment of large claims against the Government, and make terms with the Indians to take from them one half or three fourths or one quarter of the amount of money they may obtain from the Government. The object of this section is to protect the Indians and the Government both against these claim agents.

Nation, 112 F.3d at 548; Altheimer & Gray v. Sioux Mfg. Corp., 983 F.2d 803 (7th Cir. 1993). The legislative history does not, however, fix the precise scope and reach of the statutory text. See Cong. Globe, at 1483.[7]

_____

Cong. Globe, at 1484 (comments of Senator Corbett), and,

> I have seen some contracts that some of these Indian agents have made with Indians, their whole duty being to receive the money from the Government, and the rates of compensation varied from thirty-three to fifty percent.

Id. (comments of Senator Davis), and,

> Not content with cheating white men, the effort has been made to plunder the Indians, and we have persons calling themselves lawyers, some of them generals, who have hunted around among the Indian tribes and made contracts with them to come here and take care of their interests, when they were not worth the powder it would take to shoot them; men . . . who, professing to have an influence here in Congress, have got these poor people to agree to pay them large sums of money, and when we have voted appropriations supposing that we were doing it for the benefit of the Indian tribes, to take care of them and save them money, a large portion of it has gone into the hands of corrupt and dishonest men.

Id. at 1485 (comments of Senator Wilson).

[7]Compare the following:

> These persons would be precluded from making any contract or agreement that they might desire to enter into concerning their property.

Cong. Globe, at 1483 (comments of Senator Davis), with,

Two practical limitations do readily suggest themselves. Section 81 cannot be limited only to contracts actually trading services for land, such as that at issue in Pueblo of Santa Rosa, because the language "agreements . . . relative to" reaches beyond outright conveyance. A.K. Mgmt. Co. v. San Manuel Band of Mission Indians, 789 F.2d 785, 787 (9th Cir. 1986); accord United States ex rel. Shakopee Mdewakanton Sioux Cmty. v. Pan American Mgt. Co., 616 F. Supp. 1200, 1215-18 (D. Minn. 1985) (holding Section 81 applicable to all contracts "relative to" Indian lands), appeal dismissed, 789 F.2d 632 (8th Cir. 1986). Nor does the statute have unlimited reach, for in Bacon, we rejected the proposition that Section 81 encompasses all contracts made with Indians on Indian land. 21 F.3d at 211. We also took a narrow view of the statute in limiting its effect on services contracts to those compensating the service-provider from tribal funds. Brown v. United States, 486 F.2d 658, 661 n.2 (8th Cir. 1973).

With these cabining principles in mind, we look to the few instances in which our sister circuits have had opportunity to address this language. In Wisconsin Winnebago Business Committee v. Koberstein, 762 F.2d 613, 614 (7th Cir. 1985), the Seventh Circuit reviewed a bingo management agreement between the tribe and Ho-Chunk Management Corporation. The agreement obligated Ho-Chunk to obtain financing for, construct, improve, develop, manage, operate and maintain a tribal bingo hall. Id. The agreement gave Ho-Chunk an exclusive right to operate and maintain the property and also specified that the tribe would not take any action that would encumber the property without Ho-Chunk's consent. Id. at 615. On the day the hall was to open, the tribe

It is intended to cut off, and I think will cut off, the reception of immense fees for counsel and advice; but I do not think it will prevent the contracts named by [another Senator], of one Indian with another in swapping horses, or in exchanging farms.

Id. at 1486 (comments of Senator Harlan).

voted to rescind the agreement, and enacted a tribal ordinance requiring a tribal permit to run a bingo enterprise. Id. at 616. When Ho-Chunk continued running its operation, the tribe filed suit, challenging the agreement under Section 81.

The Seventh Circuit rejected Ho-Chunk's interpretation of the statute, which would have limited it to cases involving trust property, payments from trust funds or amounts owing from the United States. Id. at 617. The court held "[i]t is obvious from the broad language 'relative to their lands' that Congress intended to cover almost all land transactions in Indian property." Id. at 618. The court shored up this conclusion with reference to longstanding federal policy of regulating transactions in Indian land. Id. Because the agreement permitted Ho-Chunk to record the agreement, because the tribe was prohibited from encumbering the property and because the agreement gave Ho-Chunk the absolute right to control the operation, the court held it "relative to" Indian lands. Id. at 619.

In A.K. Management, the Ninth Circuit applied Section 81 to a bingo management agreement, which gave A.K. Management "the exclusive right to construct a bingo facility and operate bingo games on the Band's reservation for twenty years." 789 F.2d at 786. The Band agreed not to unreasonably withhold approval for any actions made necessary in performance of the agreement. The contract also specifically incorporated Section 81's requirements. Id. Because the agreement gave A.K. Management exclusive rights over the operation, the court concluded it was "relative to [Indian] lands" under Section 81. Id. at 787.

The Ninth Circuit again applied Section 81 to a bingo management contract in Barona Group of the Capitan Grande Band of Mission Indians v. American Management & Amusement, Inc., 840 F. 2d 1394 (9th Cir. 1987). That agreement obligated American to finance, construct and for twenty-five years operate a bingo facility on the reservation. Id. at 1397. After the operation shut down in 1986, the tribe challenged the agreement under Section 81. Id. Relying on A.K. Management and

-11-

Wisconsin Winnebago, the court found the contract subject to Section 81. The agreement "vest[ed] in contractor the exclusive right and obligation to finance, construct, improve, develop, manage, operate and maintain the property." Id. at 1403 (emphasis omitted). Moreover, it "prohibit[ed] the Band from operating any other bingo games on its property during the term of the agreement." Id. The court held that these absolute rights to build and operate the facility took the agreement within Section 81. Id. at 1403-04.

In Altheimer & Gray, the Seventh Circuit reviewed Section 81's application to a letter of intent between the Sioux Manufacturing Corporation and Medical Supplies & Technology, Inc., under which the tribe was to manufacture latex medical products. 983 F.2d at 806. It posed a four-question test to determine whether a management contract was "relative to" Indian lands:

> 1) Does the contract relate to the management of a facility to be located on Indian lands? 2) If so, does the non-Indian party have the exclusive right to operate that facility? 3) Are the Indians forbidden from encumbering the property? 4) Does the operation of the facility depend on the legal status of an Indian tribe being a separate sovereign?

Id. at 811. The court also noted that none of these elements was the *"sine qua non* of a contract which relates to Indian lands." Id. Applying its test to the parties' agreement, the court noted that the manufacturing facility pre-dated the letter of intent and was wholly owned and operated by the tribe. Moreover, the tribe did not convey exclusive control over the operation, but rather remained heavily involved in the venture. No provision prevented the tribe from encumbering the land. Id. at 812. Finally, the business derived no special status from tribal immunity. Id. Given these facts, the court found the agreement to fall outside Section 81.

The common element to these holdings has been whether by an agreement a tribe transferred a property interest in tribal lands. In Wisconsin Winnebago, the tribe gave up its right to encumber its own property, and also conferred an exclusive right to operate bingo facilities on its land. In A.K. Management, the tribe again conferred an exclusive right of operation on its contract partner. In Barona Group, the tribe similarly conferred an exclusive right and obligation to finance, construct, improve, develop, manage, operate and maintain the property. These contracts all, then, implicated one or more of the bundle of ownership rights inherent in the notion of real property. Conversely, in Altheimer & Gray, the tribe did not give up any incidents of ownership. Rather, the contracting company in that case was more properly viewed as a contractor or a consultant. 983 F.2d at 812.

This offers a sensible understanding of the statute–"relative to" Indian lands includes all contracts which put in play actual incidents and rights of property ownership. This comports with the conclusion of the court in Shakopee, which found bingo management agreements "relative to" Indian land because they were "inextricably tied up" with property rights. 616 F. Supp. at 1218.[8] In

<hr>

[8]The United States relies heavily on the district court's opinion in Shakopee, which found bingo contracts inextricably entwined with "property rights flowing from the establishment of the bingo operations on tribal trust lands" because only given tribal sovereign immunity over tribal lands could the tribe carry on the gaming activities. 616 F. Supp. at 1218. Reply Brief for Petitioners at 9. The Seventh Circuit contemplated a similar but non-dispositive element in Altheimer, in asking the question, "Does the operation of the facility depend on the legal status of an Indian tribe being a separate sovereign?" 983 F.2d at 811. The United States' argument suggests this relationship renders all gaming contracts "relative to" Indian lands.

The district court's conclusion in Shakopee, however, turns on the proposition that sovereign immunity is a property right. It is true that sovereign immunity and property rights may overlap, see Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 287-88 (1997), but sovereign immunity itself is not a property right. One does not

-13-

that case, as in the others we have discussed, the tribe gave over an absolute right to construct, maintain and operate the bingo facility. More importantly, it also gave up the right to independently establish any other bingo operations on its lands. Id. This reading places within the statute those cases with which Congress was concerned, and governs all transactions trading services for Indian land, but excludes agreements in which Congress manifestly had no interest and avoids unnecessarily encumbering property and contract law as they apply to Indian tribes. See Penobscot Indian Nation, 112 F.3d at 554 (favoring a narrower interpretation of Section 81 in order to avoid adverse policy consequences).[9]

---

acquire immunity by purchasing land, nor may it be alienated to another by selling the land. Sovereign immunity is a function of federal law, not state law. Kiowa Tribe of Oklahoma v. Manufacturing Tech., Inc., 523 U.S. 751, 759 (1998). It flows not just from land but also from membership in a tribe or nation. Cf. Alisa Cook Lauer, note, Dispelling the Constitutional Creation Myth of Tribal Sovereignty, *United States v. Weaselhead*, 78 Neb. L. Rev. 162, 180 (1999) (arguing tribal sovereignty is more innate than a legal creation). While tribal immunity may attach to after-acquired land, that immunity does not attach to and travel with the land. See, e.g., Nevada v. Hicks, 121 S. Ct. 2304, 2310-11 (2001) (holding that ownership of land presents only one factor in considering tribal jurisdiction, and noting that regulatory authority over non-members must "be connected to that right of the Indians to make their own laws and be governed by them"). Indeed, property lines do not define the bounds of immunity. See Kiowa Tribe, 523 U.S. at 760 (sovereign immunity applies to both tribal governmental and private commercial activity both on and off the reservation).

The United States' argument has prima facie appeal, given the apparent connection between gaming and tribal lands. Yet we think upon closer analysis, the land is merely a necessary intermediate, but not the operative element in the equation. Gaming occurs not because of tribally-owned land, but because of sovereign immunity.

[9]We are reminded that Indian statutes ought be drawn in favor of the tribes. See, e.g., Bryan v. Itasca County, 426 U.S. 373, 392 (1976). However, the rule does not require that the Indian party should win in each individual case.

The Rental Agreement and the Employment Agreement, therefore, are not "relative to" Indian land. The remaining portions of the Rental Agreement deal with various instances of sitework to be performed, or which had already been performed, by Turn Key. These include "dirt work, stockpiling gravel, finishing parking and paving facilities, and installing water, sewer, and electrical services." In performing these services, Turn Key has and will be acting not as a property owner, or as one with any property rights, but only as a contractor. The Rental Agreement did not vest any property interest in Turn Key, but only contract rights. Accordingly, this Agreement is not "relative to" Indian Lands.

The Employment Agreement similarly does not fall within Section 81. That Agreement hired Wayne Barber as an at-will employee to "supervise, oversee and operate, under direction and control of the Oglala Sioux Tribe," the Prairie Wind Casino. It further provides that Barber will remain "under the direct supervision of, and report directly to the Executive Director of the Tribe." Barber's enumerated duties include those of a manager, but no provision of the Employment Agreement transfers to him any property interest in or exclusive rights over Indian land. Indeed, the Employment Agreement specifically charged Barber, and not the Tribe, with the obligation to "[k]eep the Project, its buildings, improvements, and Tribal trust land of which they are a part, free and clear of all mechanics and other liens or encumbrances, of whatever kind or nature, other than Turn Key Gaming Inc.'s [interest therein]." Because the Employment Agreement does not transfer any interest in Tribal lands to Barber, it also falls outside Section 81.

## III.

Because both the Employment Agreement and the Rental Agreement fall outside Section 81, neither requires approval under that Section, and both remain enforceable contracts. Accordingly, the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.