**A.K. MANAGEMENT COMPANY, a Michigan Corporation, Plaintiff-Appellant,**

v.

**The SAN MANUEL BAND OF MISSION INDIANS, a Federally recognized Indian Tribe, Defendant-Appellee.**

No. 84–6632.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 5, 1985.

Decided May 13, 1986.

Lesley M. Vaughn, Smith & Holland, Los Angeles, Cal., for plaintiff-appellant.

Jerome L. Levine, Neiman, Billet, Albala & Levine, Los Angeles, Cal., for defendant-appellee.

Before: FLETCHER, PREGERSON, and CANBY, Circuit Judges.

PREGERSON, Circuit Judge.

A.K. Management Company ("AK") appeals the district court's dismissal of its action for declaratory relief. The district court found that AK's Management Agreement ("Agreement") entered into with the

San Manuel Band of Mission Indians ("the Band") without the approval of the Secretary of the Interior and the Commissioner of Indian Affairs was void under 25 U.S.C. § 81 (1982)[1] and therefore unenforceable. We affirm the district court's decision.

### FACTS

Plaintiff-Appellant, AK, manages bingo projects on Indian reservations. Defendant-Appellee, the Band, is a federally recognized Indian tribe that resides on its reservation in the County of San Bernardino, California.

On January 7, 1984, AK and the Band entered into an agreement, which gave AK the exclusive right to construct a bingo facility and operate bingo games on the Band's reservation for twenty years. Net profits from the games were to be divided between them, sixty percent to the Band and forty percent to AK.

In section 10(a) of the Agreement, the Band covenants to "act in good faith and take all necessary steps and execute ... [the] agreements required of it pursuant to the provisions of this Agreement, and shall not unreasonably withhold its approval of any act or thing for which such approval may be required hereby." Section 19(a) provides that the "Agreement, and the obligations of Manager [AK] described herein, are expressly conditioned upon ... [a]pproval of this Agreement by the United States Department of the Interior, Bureau of Indian Affairs, and the receipt by Manager of written approval of such agreement." Section 23 provides that "[b]oth parties hereto shall devote their best efforts to the fulfillment of their respective duties and obligations hereunder in accordance with the provisions of this Agreement."

Further, in section 10(e), the Band "waives sovereign immunity with respect to any action which may be brought by Manager to enforce or interpret this Agreement...." Section 25 provides that "[i]n the event that any portion of this Agreement is determined null, void or unenforceable, then the remaining provisions of this Agreement shall remain in full force and effect."

On January 10, 1984, three days after signing the Agreement, the Band notified AK that it would not recognize the Agreement. The Agreement was never signed or approved by the Bureau of Indian Affairs.

On September 13, 1984, AK filed this diversity suit in district court seeking a declaratory judgment that the Agreement is fully valid, binding, and enforceable. In response, the Band filed a motion to dismiss for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). On November 28, 1984, the district court dismissed AK's First Amended Complaint for Declaratory Relief with prejudice. The district court ruled that the contract upon which AK based its claim for relief was null and void under 25 U.S.C. § 81 (1982), and was, therefore, unenforceable.

On December 21, 1984, AK timely filed an appeal to this court. AK challenges the district court's order of dismissal asserting that: (1) 25 U.S.C. § 81 (1982) does not apply to the Agreement; (2) even if 25 U.S.C. § 81 (1982) applied to the Agreement, general contract principles impose a duty on the Band to seek BIA approval;

---

1. 25 U.S.C. § 81 (1982) provides in pertinent part:

> *No agreement shall be made by any person with any tribe of Indians* ... for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him, or any other person in consideration of services for said Indians *relative to their lands,* or to any claims growing out of, or in reference to, annuities, installments, or other moneys, claims, demands, or thing, under laws or treaties with the United States ... *unless such contract or agreement be executed and approved as follows:*
>
> .   .   .   .   .
>
> *Second. It shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it.*
>
> .   .   .   .   .
>
> *All contracts or agreements made in violation of this section shall be null and void....* (Emphasis added.)

and (3) the Band has waived its sovereign immunity to suit.

## STANDARD OF REVIEW

An order granting a motion to dismiss is reviewed *de novo*. *Miller v. Oregon Liquor Control Commission*, 688 F.2d 1222, 1223 (9th Cir.1982).

## DISCUSSION

I. *Application of 25 U.S.C. § 81 to the Agreement.*

Initially, AK contends that its bingo management agreement does not fall within the scope of 25 U.S.C. § 81 (1982). AK argues that section 81 cannot apply to bingo management agreements because it applies only to contracts that convey tribal lands or involve tribal funds. AK contends that the instant Agreement involves neither, because the Band is not conveying any portion of the reservation nor investing any tribal funds under the Agreement.

■ AK's argument fails to recognize the specific language of section 81 which refers to "agreements ... *relative to* [Indian] lands." (Emphasis added.) Thus, it is not necessary that Indian lands actually be conveyed. "Until Congress repeals or amends the Indian ... statutes ... we must give them a 'sweep as broad as [their] language' and interpret them in light of the intent of the Congress that enacted them." *Central Machinery Co. v. Arizona State Tax Commission*, 448 U.S. 160, 166, 100 S.Ct. 2592, 2596, 64 L.Ed.2d 684 (1980) (analyzing Indian Trader statutes) (citations omitted). The broad language of section 81 expresses congressional intent to cover almost all Indian land transactions.

This literal reading of the statute is supported by the longstanding policy of the federal government to regulate Indian land

transactions. *See generally* F. Cohen, *Handbook of Federal Indian Law*, 508–10 (1982 ed.). Section 81 was enacted by Congress with the intent to protect the Indians from "improvident and unconscionable contracts." *In re Sanborn*, 148 U.S. 222, 227, 13 S.Ct. 577, 579, 37 L.Ed. 429 (1893). Because of this policy, we conclude that there is no reason to disregard the plain language of the statute in this case. *See Wisconsin Winnebago Business Committee v. Koberstein*, 762 F.2d 613, 618 (7th Cir.1985).[2]

■ Because the Agreement gives the non-Indian contracting party, AK, the exclusive right to build and control the operation of the bingo facility located on tribal trust lands and prohibits the Band from encumbering the land, we hold that the instant Agreement is "relative to [Indian] lands" under 25 U.S.C. § 81 (1982).[3] *See Wisconsin Winnebago*, 762 F.2d at 619.

Next, AK argues that section 81 should not apply to bingo management agreements because to do so would be inconsistent with current federal policy of encouraging Indian self-determination and ending paternalism. In support of this argument, AK points to President Reagan's 1983 statement on Indian policy and several letters of the BIA discussing bingo management contracts. AK's reliance on BIA letters and President Reagan's statement as representing current federal policy on bingo management contracts is misplaced. One BIA letter stated that its approval of the Barona Group Bingo Agreement was not required because neither tribal trust land nor funds were involved. Further, the letter was "limited only to the question of the need of Bureau approval of the Barona Group Bingo Agreement" and "in no way represents the Bureau or the Department of Interior's policy or position regarding

---

**2.** In addition, the court in *Wisconsin Winnebago* found that although Congress has enacted statutes requiring the BIA's approval of specific Indian land transactions, these later acts of Congress did not cover the entire subject matter of section 81. Thus, the court concluded that Congress did not impliedly repeal section 81. The court held that section 81 will govern transac-

tions relative to Indian lands for which Congress has not passed a specific statute. *Wisconsin Winnebago*, 762 F.2d at 619.

**3.** We need not determine whether section 81 applies to any other contract entered into by the Band.

the Indian Operation of bingo games in the State of California." [4] Another BIA letter, although stating that the BIA routinely applies section 81 only to contracts for attorney services, concludes that the section is ripe for legislative revision because its language does support broader applications of section 81.[5] Finally, President Reagan's policy address is unrelated to the Agreement in the instant case.[6]

Finally, AK asserts that applying section 81 to bingo management contracts creates uncertainty as to whether other contracts fall under section 81. AK argues that it would be impractical and nearly impossible to subject all contracts made by Indians with non-Indians to section 81 scrutiny. AK suggests that subjecting the instant Agreement to section 81 scrutiny may cause systematic renunciation by Indians of any contract made without BIA approval, and thus no one will want to enter into routine contracts with Indians.

Section 81 plainly puts all parties on notice that any contract that relates to tribal lands or funds is null and void without BIA approval. AK is charged with knowledge of this statute, and in fact, the terms of the

Agreement itself recognize this prerequisite. Thus, AK conducted business with the Band at its own risk pending BIA approval of the Agreement.

## II. *Duty to seek BIA approval.*

AK asserts that even if section 81 applies to the Agreement, this court should find that the Band is nonetheless obligated under general contract principles to seek BIA approval of the Agreement. Specifically, AK contends that the Band has both an express and implied duty of good faith and fair dealing to seek BIA approval of the Agreement.[7]

First, AK points to sections 10(a) and 23 of the Agreement wherein the Band expressly covenanted to act in good faith and use its best efforts to fulfill its obligations under the Agreement. Section 19 of the Agreement expressly provides that the Agreement is conditioned upon its approval by the BIA. Second, AK asserts that all contracts contain an implied covenant of good faith and fair dealing that requires each contracting party to refrain from injuring the right of the other to receive the benefits of the agreement.[8]

**4.** Letter from the Acting Superintendent of the Southern California Agency of the BIA to Harrison W. Hertzberg, Esq. (October 6, 1981).

**5.** Memorandum from the Acting Associate Solicitor of Indian Affairs to the Deputy Assistant Secretary of Indian Affairs (Aug. 1983). Additionally, AK refers to the BIA's guidelines memorandum of July 20, 1984 concerning tribal bingo management contracts. The memorandum takes issue with the decision in *Wisconsin Winnebago,* and states that the BIA intends to seek legislative clarification of 25 U.S.C. § 81 (1982).

In fact, on November 18, 1983, a bill was introduced in the United States House of Representatives which would regulate bingo management agreements. The bill provided that, "subject to the approval of the Secretary, a tribe may enter into a management contract for the operation and management of a tribal gambling enterprise for a reasonable fee which shall not be based upon any percentage of the gross or net revenue from operation...." H.R.4566, 98th Cong., 1st Sess. (1983). The bill died in committee, but has been reintroduced. H.R.1920, 99th Cong., 1st Sess. (1985); S.902, 99th Cong., 1st Sess. (1985).

In any event, AK cannot rely on the BIA memorandum because it was issued in July

1984, long after the execution of the instant Agreement in January 1984.

**6.** Statement by President Reagan, Indian Policy (January 24, 1983), *reprinted in Public Papers of the Presidents: Ronald Reagan 1983* 96, 99.

The President's language relied upon by AK is as follows: "This nation's economic health—and that of the tribes—depends on adopting this Administration's full Economic Recovery Program. This program calls for eliminating excessive Federal spending and taxes, *removing burdensome regulations,* and establishing a sound monetary policy." (Emphasis added.)

**7.** Section 81 and the case law are unclear as to which party, i.e., the Indian or non-Indian, is to submit the contract to the BIA for review. The BIA guidelines memorandum issued July 1984, does establish that "no [bingo management] contract should be reviewed unless submitted for review by a resolution of the governing body of the tribe."

**8.** In support of this argument, AK cites: *San Jose Production Credit Association v. Old Republic Life Insurance Co.,* 723 F.2d 700 (9th Cir. 1984); *Reinharcz v. Chrysler Motors Corp.,* 514

Further, AK asserts that a party who prevents fulfillment of a condition of his own obligation cannot rely on the condition to defeat his own liability. AK contends that the Band is attempting to avoid its own contractual obligation by refusing to seek BIA approval when BIA approval is a condition precedent to the Band's performance under the Agreement. AK argues that the Band cannot be allowed to escape contractual liability by its own failure to act.[9]

■ Whatever the persuasive force of these arguments, it is doubtful that general contract principles apply to an agreement subject to 25 U.S.C. § 81 (1982). Section 81 explicitly provides that a contract is "null and void" without written approval from the BIA. Therefore it is logical to conclude that an agreement without BIA approval must be null and void in its entirety. No part of it may be enforced or relied upon unless and until BIA approval is given.[10] BIA approval is an absolute prerequisite to the enforceability of the contract. To give piecemeal effect to a contract as urged by AK, would hobble the statute. The plain words of section 81 simply render this contract void in the absence of BIA approval. Since it is void, it cannot be relied upon to give rise to *any* obligation by the Band, including an obligation of good faith and fair dealing. Accordingly, we find that general contract principles do not impose a duty on the Band to seek BIA approval of the Agreement. *See Wisconsin Winnebago*, 762 F.2d at 621 (bingo management company failed to obtain "contract rights" because of its failure to receive approval from the BIA).

### III. *Waiver of sovereign immunity to suit.*

■ It is well established that Indian tribes enjoy the sovereign's common law immunity to suit. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978). A tribe cannot be sued without its consent or the consent of Congress. *Id.* Any such waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *Id.* at 58, 98 S.Ct. at 1677 (quoting *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953–54, 47 L.Ed.2d 114 (1976)).

■ AK asserts that the Band in sections 10(e) and 25 of the Agreement expressly waived its sovereign immunity to suit and made the immunity clause severable from the other provisions of the Agreement. Again, the waiver of sovereign immunity is clearly part of the Agreement, and is not operable except as part of that Agreement. Since the entire contract is inoperable without BIA approval, the waiver is inoperable and, therefore, the tribe remains immune from suit.

AFFIRMED.

---

F.Supp. 1141 (C.D.Cal.1981); *Betts v. Allstate Insurance Co.*, 154 Cal.App.3d 688, 201 Cal.Rptr. 528 (1984). These cases involve insurance companies and are not even remotely related to Indian law. AK also relies on 3 A. Corbin, *Corbin on Contracts* §§ 541, 570 (1960); C. Kaufman, *Corbin on Contracts* § 654A (Supp. 1984).

**9.** In support of this argument, AK relies on: *Watson Brothers Transportation Co. v. Jaffa*, 143 F.2d 340 (8th Cir.1944); *Bewick v. Mecham*, 26 Cal.2d 92, 156 P.2d 757 (1945); and 1 A. Corbin, *Corbin on Contracts* § 165 (1960) ("Power to Cancel for Cause or on Some Condition Other Than Promisor's Own Will").

**10.** Conversely, AK argues that the Agreement should be enforceable until the BIA disapproves it. To support its argument, AK relies on *United States ex rel. Buxbom v. Naegele Outdoor Adver-*

*tising Company of California*, 739 F.2d 473 (9th Cir.1984) *cert. denied*, —— U.S. ——, 105 S.Ct. 785, 83 L.Ed.2d 799 (1985). There, the court held that BIA approval of a contract is retroactive to the date of the contract. *Id.* at 474. AK argues that if this court were to hold the Agreement null and void, it would be inconsistent with *Buxbom* in that a contract which is null and void is incapable of being retroactively approved. The *Buxbom* court, however, clearly indicates that section 81 renders the contract void if the agreement at issue was made without BIA approval. *Id.*

Moreover, AK's argument is ill-founded. Again, AK relies on general contract principles, *e.g.*, 1 A. Corbin, *Corbin on Contracts* § 7 (1960), when section 81 provides explicit statutory authority to the contrary.