[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-11997

_____

D.C. Docket No. 0:10-cv-60483-WJZ

CONTOUR SPA AT THE HARD ROCK, INC.,
a Florida corporation,

Plaintiff - Appellant,

versus

SEMINOLE TRIBE OF FLORIDA,
a federally recognized Indian tribe,
MITCHELL CYPRESS, et al.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 30, 2012)

Before MARCUS and BLACK, Circuit Judges, and EVANS,[*] District Judge.

MARCUS, Circuit Judge:

_____

[*] Honorable Orinda Evans, United States District Judge for the Northern District of
Georgia, sitting by designation.

This case arises out of a leasing agreement between Contour Spa ("Contour") and the Seminole Tribe of Florida ("the Tribe") that turned sour. Contour appeals from a district court order dismissing its Amended Complaint for lack of subject matter jurisdiction on account of the Tribe's sovereign immunity. Contour offers three reasons to avoid immunity: first, and most basic, Contour claims that the Tribe's removal of this case to federal court constitutes a voluntary waiver of the Tribe's immunity, relying on the Supreme Court's Eleventh Amendment case of Lapides v. Bd. of Regents of the Univ. Sys. of Ga., 535 U.S. 613 (2002); Contour also says that Congress has authorized its suit by creating an implied cause of action under the Indian Civil Rights Act; and finally, Contour argues that principles of equitable estoppel prevent the Tribe from asserting immunity.

The district court rejected all three arguments, and we now affirm. Because the problems of inconsistency and unfairness that were inherent in the procedural posture of Lapides are absent here, and because an Indian tribe's sovereign immunity is of a far different character than a state's Eleventh Amendment immunity, we decline to extend Lapides. As for Contour's Indian Civil Rights Act claim, it must fail because the Supreme Court has already held that Indian tribes are immune from suit under the statute. Finally, the equitable estoppel claim is

2

unavailable because it is grounded on a waiver provision contained within a lease agreement that is wholly invalid as a matter of federal law.

**I.**

Because we are reviewing the district court's order granting the tribal defendants' motions to dismiss, we take as true the facts as alleged in Contour's complaint and attached exhibits.  See Grossman v. Nationsbank, N.A., 225 F.3d 1228, 1231 (11th Cir. 2000) (per curiam).  The Seminole Tribe of Florida is a federally recognized Indian tribe that owns and operates the Seminole Hard Rock Hotel and Casino in Hollywood, Florida.  Contour operated a spa facility located in the Hard Rock from May 2004 through March 2010 pursuant to a long-term lease that provided for an initial period of ten years followed by four renewal terms of five years each.

In the lease the Tribe expressly waived its sovereign immunity concerning any lawsuits Contour might bring based on the Tribe's default or breach of the lease agreement.[1]  Most pertinently, however, the entire lease's validity was

---

[1] Specifically, the lease provides that if a number of procedural requirements are met, the Tribe "consents to the jurisdiction of, to be sued in and to accept and be bound by any order or judgment of the United States District Court for the Southern District of Florida, the Circuit Court for the 17th Judicial Circuit in and for Broward County, Florida, and any federal or state court having appellate jurisdiction thereover" where Contour "alleges a default . . . or a breach by the Tribe of one or more of the specific warranties, representations, obligations or duties expressly assumed by the Tribe under the terms of this Lease."

3

explicitly conditioned upon approval by the Secretary of the Interior:  "The [agreement] is all conditioned upon approval of this Lease by the Secretary of the Interior, or her authorized representative ('the Secretary')."  The lease also incorporated by reference the regulations prescribed by the Secretary pursuant to 25 C.F.R. Part 162.

It is undisputed that these regulations, as well as 25 U.S.C. § 81, apply to the putative lease, even if they had not been expressly incorporated into the lease's terms.  Both the regulations and the statute explicitly condition the validity of the lease on the approval of the Secretary of the Interior.  25 U.S.C. § 81(b) ("No agreement or contract with an Indian tribe that encumbers Indian lands for a period of 7 or more years shall be valid unless that agreement or contract bears the approval of the Secretary of the Interior or a designee of the Secretary."); 25 C.F.R. § 162.604(a) ("All leases made pursuant to the regulations in this part shall be in the form approved by the Secretary and subject to his written approval.").[2]

Although the chairman of the Seminole Tribal Council, Mitchell Cypress, submitted the lease to the Secretary of the Interior for approval, it was never

---

[2] The statutory authority for these regulations comes in part from 25 U.S.C. § 415, which provides that "[a]ny restricted Indian lands, whether tribally, or individually owned, may be leased by the Indian owners, with the approval of the Secretary of the Interior, for public, religious, educational, recreational, residential, or business purposes."  25 U.S.C. § 415(a) (emphasis added).

4

approved.  Contour alleges, however, that the Tribe knowingly made false oral and written assertions that the lease was valid.  The complaint highlights a letter dated November 26, 2003, from the Seminole Tribe's authorized representative referring to the lease as having been "fully executed."  Contour also included in the complaint a reference to a conversation its owner had with the tribal representative whereby Contour was assured "that all paperwork needed for the Lease had been submitted and approved," and that the spa had to be open for business by May 17, 2004.  The tribal representative also allegedly said: "Girl, you are good to go. Mazal tov.  Congratulations."  Contour then spent more than $1.5 million to design and build the spa, which opened at the Tribe's hotel on May 17, 2004.

The deal between the parties began to sour in 2005 when Contour wanted to begin charging Hard Rock Hotel guests to use the fitness center at the spa.  But what really set the stage for this lawsuit was a comment made by a tribal representative in June 2007 that the "Lease Agreement was no good, and could be terminated at any time, since approval . . . had never been obtained from the Bureau of Indian Affairs."  Contour wrote to the Bureau of Indian Affairs ("BIA"), an agency housed within the Department of the Interior, and discovered that although the Seminole Tribe had submitted the lease, it had never been approved. Instead, Contour learned, the BIA had sent a reply letter to the Seminole Tribe

5

dated May 27, 2004 (ten days after the spa opened), noting a series of deficiencies in the lease and requesting that the Seminole Tribe correct them and resubmit the lease application for the Secretary's approval. Allegedly, the Tribe never shared any of this with Contour. Once it learned of the BIA's letter, however, Contour promptly advised the Tribe that Contour agreed to the changes requested by the BIA, but the Tribe still failed to respond or to resubmit the lease for approval.

Notwithstanding having learned that the lease had never been approved, Contour continued to operate its spa at the hotel. But Contour's operations at the Hard Rock ended on March 17, 2010, when the Tribe's counsel e-mailed a letter to Contour informing Contour that the Tribe had decided to retake the premises and to permanently close the spa. By the next day, the Seminole Tribe had padlocked the doors on Contour's business and would only allow Contour access when escorted by tribal security and for the limited purpose of removing personal property.

Contour wasted no time in going to court. On March 19, 2010, Contour filed suit against the Seminole Tribe in Florida Circuit Court for Broward County, seeking emergency declaratory and injunctive relief. Shortly thereafter, the Tribe removed the case to the United States District Court for the Southern District of Florida.

6

Contour then took the opportunity to amend its complaint. In addition to the Tribe itself, Contour added as defendants the Tribe's Chairman, Mitchell Cypress, unnamed tribal member(s) John Doe, and unnamed non-tribal defendant(s) Richard Roe. The Amended Complaint alleged two federal claims and five state-law counts. Counts I and II sought declaratory and injunctive relief against all tribal defendants under the Indian Civil Rights Act, 25 U.S.C. §§ 1301-02, and the Indian Long Term Leasing Act and its accompanying regulations, 25 U.S.C. § 415 and 25 C.F.R. pt. 2, 162. The remaining counts all sought damages under state-law causes of action for wrongful eviction, unlawful entry and detention, fraud, promissory estoppel, and unjust enrichment. The federal charges were limited to the tribal defendants.

Both the Seminole Tribe and, separately, Chairman Cypress, moved to dismiss for lack of subject matter jurisdiction, asserting tribal sovereign immunity. After full briefing, the district court dismissed the federal claims, and remanded the state-law claims back to state court, finding no basis for retaining supplemental jurisdiction under 28 U.S.C. § 1367. This timely appeal followed.

## II.

"We review de novo the district court's dismissal of a complaint for sovereign immunity." Sanderlin v. Seminole Tribe of Fla., 243 F.3d 1282, 1285

7

(11th Cir. 2001); accord Florida v. Seminole Tribe of Fla., 181 F.3d 1237, 1240-41 (11th Cir. 1999); Fla. Paraplegic, Ass'n v. Miccosukee Tribe of Indians of Fla, 166 F.3d 1126, 1128 (11th Cir. 1999).

Although the Supreme Court has expressed some doubt about the continued wisdom of the tribal immunity doctrine, it is nonetheless clear that "[a]s a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 754 (1998); accord Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla., 498 U.S. 505, 509 (1991) ("Indian tribes are domestic dependent nations that exercise inherent sovereign authority over their members and territories.  Suits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation." (internal quotation marks and citation omitted)); Furry v. Miccosukee Tribe of Indians of Fla., 2012 WL 2478232, *2 (11th Cir. June 29, 2012); Sanderlin, 243 F.3d at 1285; Seminole Tribe, 181 F.3d at 1241; Fla. Paraplegic, 166 F.3d at 1130-31.

Contour offers three reasons for why tribal immunity should not bar this lawsuit: first, Contour claims that removal of the case to federal court amounted to a waiver of the Tribe's sovereign immunity; Contour also says that the Indian

8

Civil Rights Act creates an implied cause of action against the Tribe; and finally, Contour contends that equitable principles should hold the Tribe to its express waiver of sovereign immunity, even though the lease containing that waiver is plainly invalid as a matter of law since the Secretary of the Interior never approved it. We address each argument in turn.

## A.

The first and most substantial argument is that the Supreme Court's Eleventh Amendment holding in Lapides should be extended in order to establish that when an Indian tribe voluntarily removes a case to federal court it too waives sovereign immunity from suit. We are unpersuaded.

In Lapides, an employee of the Georgia state university system sued the University Board of Regents and individual board members in Georgia state court, alleging violations of both Georgia tort law and federal law. Lapides, 535 U.S. at 616. By statute, Georgia had expressly waived its immunity from suit for claims sounding in tort and brought in state court, but did not waive immunity from actions brought in federal court. Ga. Code Ann. § 50-21-23(b) ("The state waives its sovereign immunity only to the extent and in the manner provided in this article and only with respect to actions brought in the courts of the State of Georgia. The state does not waive any immunity with respect to actions brought in the courts of

9

the United States.").

Not surprisingly, Georgia then removed the cause to federal court based on the federal claim, which had been brought under 42 U.S.C. § 1983.  Lapides, 535 U.S. at 616.  By the time the case reached the Supreme Court, the section 1983 claim had dropped out of the suit because the individual defendants had been dismissed from the case on qualified immunity grounds and the state of Georgia could not be sued for money damages under section 1983.  Id. at 616-17.  Thus, Justice Breyer's opinion writing for a unanimous Supreme Court began the analysis by emphasizing the narrow question it was answering:

> Lapides sought certiorari.  We agreed to decide whether "a state waive[s] its Eleventh Amendment immunity by its affirmative litigation conduct when it removes a case to federal court  . . . ."
>
> It has become clear that we must limit our answer to the context of state-law claims, in respect to which the State has explicitly waived immunity from state-court proceedings.  That is because Lapides' only federal claim against the State arises under 42 U.S.C. § 1983, that claim seeks only monetary damages, and we have held that a State is not a "person" against whom a § 1983 claim for money damages might be asserted.  Hence this case does not present a valid federal claim against the State.  Nor need we address the scope of waiver by removal in a situation where the State's underlying sovereign immunity from suit has not been waived or abrogated in state court.

Id. at 617-18 (alterations in original) (emphases added) (citations omitted); accord id. at 618 ("[T]he question presented is not moot.  We possess the legal power here

10

to answer that question as limited to the state-law context just described.").

The Supreme Court ultimately determined that the state of Georgia did indeed waive its Eleventh Amendment immunity by removing the case to federal court. See id. at 619-24. Notwithstanding the express limitation on its holding, the Court's subsequent reasoning was in many ways quite broad. The Court began by observing that "[i]t would seem anomalous or inconsistent for a State both (1) to invoke federal jurisdiction, thereby contending that the Judicial power of the United States extends to the case at hand, and (2) to claim Eleventh Amendment immunity, thereby denying that the Judicial power of the United States extends to the case at hand." Id. at 619 (internal quotation marks omitted). The Court further noted that "a Constitution that permitted States to follow their litigation interests by freely asserting both claims in the same case could generate seriously unfair results." Id.; accord id. at 622 ("In large part the rule governing voluntary invocations of federal jurisdiction has rested upon the problems of inconsistency and unfairness that a contrary rule of law would create."). The Court also pointed out that Georgia had "voluntarily agreed to remove the case to federal court," that "[i]n doing so, it voluntarily invoked the federal court's jurisdiction," and therefore, "unless there is something special about removal or about this case, the general legal principle requiring waiver ought to apply." Id. at 620.

11

The Supreme Court rejected Georgia's claim that waiver should not apply because "its motive for removal was benign," reasoning that "[m]otives are difficult to evaluate, while jurisdictional rules should be clear" and that "[t]o adopt the State's Eleventh Amendment position would permit States to achieve unfair tactical advantages, if not in this case, in others." Id. at 621. The Court concluded this way: "[W]e believe the rule is a clear one, easily applied by both federal courts and the States themselves. It says that removal is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's otherwise valid objection to litigation of a matter (here of state law) in a federal forum." Id. at 623-24.

A few of our sister circuits have turned Lapides into a "straightforward, easy-to-administer rule" that removal by a state waives its Eleventh Amendment immunity, regardless of whether the state has previously waived its immunity in state court or whether the removed claims arose under state or federal law. Embury v. King, 361 F.3d 562, 566 (9th Cir. 2004); accord Estes v. Wyo. Dep't of Transp., 302 F.3d 1200, 1206 (10th Cir. 2002); cf. Bd. of Regents of the Univ. of Wis. Sys. v. Phoenix Int'l Software, Inc., 653 F.3d 448, 461-62 (7th Cir. 2011) (noting that Lapides is not limited to its facts and holding that plaintiff state, by bringing suit in federal court, waived its immunity from related counterclaims).

Other circuits have declined to read Lapides quite so broadly, taking the Supreme Court at its word and limiting Lapides to its procedural posture -- instances in which a state removes claims for which it had waived its immunity in state court. See Bergemann v. R.I. Dep't of Envtl. Mgmt., 665 F.3d 336, 341-42 (1st Cir. 2011); Stewart v. North Carolina, 393 F.3d 484, 490 (4th Cir. 2005); see also Watters v. Wash. Metro. Area Transit Auth., 295 F.3d 36, 42 n.13 (D.C. Cir. 2002) (reaching same conclusion in dicta). Still other circuits have posited a middle ground, holding that a state's act of removing a case to federal court would waive its Eleventh Amendment immunity from suit but not its separate defense of immunity from liability as a matter of state law. See Lombardo v. Pa., Dep't of Pub. Welfare, 540 F.3d 190, 198-200 (3d Cir. 2008); Meyers ex rel. Benzing v. Texas, 410 F.3d 236, 250, 252-55 (5th Cir. 2005).

We need not enter into this conflict today over how best to read Lapides with respect to a state's removal of a case to federal court. Simply put, an Indian tribe's sovereign immunity is not the same thing as a state's Eleventh Amendment immunity, and Lapides in no way addressed tribal sovereign immunity. See Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Eng'g, 476 U.S. 877, 890-91 (1986) ("[B]ecause of the peculiar 'quasi-sovereign' status of the Indian tribes, the Tribe's immunity is not congruent with that which the Federal

13

Government, or the States, enjoy." (citing United States v. U.S. Fid. & Guar. Co., 309 U.S. 506, 513 (1940))).  Indeed, as the Supreme Court observed in Kiowa Tribe, "the immunity possessed by Indian tribes is not coextensive with that of the States," and "tribal immunity is a matter of federal law and is not subject to diminution by the States."  523 U.S. at 756.  Moreover, and equally important in this calculus, we may not lightly conclude that an Indian tribe has waived its immunity from suit.  Our precedents make it abundantly clear that a waiver of tribal sovereign immunity cannot be implied on the basis of a tribe's actions; rather, it must be unequivocally expressed.  See Sanderlin, 243 F.3d at 1286; Seminole Tribe, 181 F.3d at 1243.  And although the precise issue before us -- whether an Indian tribe's removal of a suit to federal court waives the tribe's sovereign immunity -- is one of first impression among the circuits, there are powerful reasons to treat an Indian tribe's sovereign immunity differently from a state's Eleventh Amendment immunity.

For starters, tribal immunity is in many respects more analogous to foreign sovereign immunity than to state Eleventh Amendment immunity.  The significance of the comparison inheres in the fact that foreign sovereigns do not waive their sovereign immunity by removing a case to federal court.  See 28 U.S.C. § 1441(d) ("Any civil action brought in a State court against a foreign state

14

. . . may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending."); Russell Corp. v. Am. Home Assurance Co., 264 F.3d 1040, 1047 n.4 (11th Cir. 2001) (explaining that 28 U.S.C. § 1441(d) "provides an absolute right of removal to the federal courts by a foreign state to resolve sovereign immunity issues" (citing In re Delta Am. Re Ins. Co., 900 F.2d 890, 893 (6th Cir. 1990))); see also Rodriguez v. Transnave Inc., 8 F.3d 284, 289 (5th Cir. 1993) ("[R]emoval by a foreign sovereign is explicitly authorized by 28 U.S.C. 1441(d) and clearly cannot constitute waiver.").

While Indian tribes do not have an express statutory right of removal, the similarities between foreign sovereign immunity and tribal immunity are nonetheless considerable. Indeed, the Supreme Court has offered just such a comparison in describing the origins of the two doctrines, as well as the federal government's role in shaping their contours:

> In considering Congress' role in reforming tribal immunity, we find instructive the problems of sovereign immunity for foreign countries. As with tribal immunity, foreign sovereign immunity began as a judicial doctrine. Chief Justice Marshall held that United States courts had no jurisdiction over an armed ship of a foreign state, even while in an American port. While the holding was narrow, "that opinion came to be regarded as extending virtually absolute immunity to foreign sovereigns." In 1952, the State Department issued what came to be known as the Tate Letter, announcing the policy of denying immunity

15

for the commercial acts of a foreign nation. Difficulties in implementing the principle led Congress in 1976 to enact the Foreign Sovereign Immunities Act, resulting in more predictable and precise rules.

Like foreign sovereign immunity, tribal immunity is a matter of federal law. Although the Court has taken the lead in drawing the bounds of tribal immunity, Congress, subject to constitutional limitations, can alter its limits through explicit legislation.

Kiowa Tribe, 523 U.S. at 759 (citations omitted).

Again, tribal immunity is a matter of purely federal law. Id.; see also South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 343 (1998) ("Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights."). Much like foreign sovereigns, Indian tribes have an interest in a uniform body of federal law in this area. Cf. Lowery v. Ala. Power Co., 483 F.3d 1184, 1197 (11th Cir. 2007) (noting that 28 U.S.C. § 1441(d) "was intended to give foreign states the discretion to use a federal forum to litigate civil actions into which they have been brought for the purpose of encouraging uniformity in that area of law" (internal quotation marks omitted)). These interests in adjudicating tribal immunity claims in a federal forum are considerable, and, thus, we are hard pressed to justify mechanically extending the decision in Lapides to this wholly different context -- whether an Indian tribe has waived its immunity from suit.[3] In

---

[3] Contour suggests that, at least in the commercial context, Indian tribes should not be able to lay claim to the policy rationale underlying foreign sovereigns' ability to preserve their

16

fact, to do so would effectively mean that an Indian tribe that has been sued in state court for violations of federal law must either forego its immunity from suit by removing the case or assert its immunity -- itself a matter of federal law -- only in state court.

We can discern no sound basis in law or logic for forcing an Indian tribe to make this choice. The Court's holding in Lapides was based in no small measure on the obvious "problems of inconsistency and unfairness" that the procedural posture of the case presented. 535 U.S. at 622. If the Supreme Court had declined to find a waiver in Lapides, then Georgia's removal of the case to federal court would have effectively operated as an end-run around its waiver of immunity in state court. Indeed, it is hard to ignore entirely the Supreme Court's express limitation of its holding "to the context of state-law claims, in respect to which the State has explicitly waived immunity from state-court proceedings." Id. at 617. In

immunity after removal. But accepting this argument would require drawing a distinction in the tribal immunity doctrine between tribal governance activities (which, under Contour's approach, presumably implicate greater federal policy concerns) and tribal commercial activities -- a distinction the Supreme Court has already rejected in Kiowa Tribe. 523 U.S. at 755 ("Though respondent asks us to confine immunity from suit to transactions on reservations and to governmental activities, our precedents have not drawn these distinctions."). Indeed, the commercial context is one area in which an Indian tribe currently enjoys even greater immunity from suit than does a foreign sovereign. Cf. Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 488 (1983) (describing the Foreign Sovereign Immunities Act's exception to a foreign sovereign's immunity from suit for "actions based upon commercial activities of the foreign sovereign carried on in the United States or causing a direct effect in the United States" (citing 28 U.S.C. § 1605(a)(2))).

17

sharp contrast, here the Seminole Tribe has in no way consented to be sued on <u>any</u> of the claims in this case in <u>any</u> forum, whether federal or state.  Plainly, the Tribe's act of removal was not an attempt to obtain "unfair tactical advantage[]." <u>Id.</u> at 621.  This further cautions against extending <u>Lapides</u> to our case.

We also find it difficult to reconcile Contour's claim that we should broadly read <u>Lapides</u> and extend its holding to tribal sovereign immunity with the Supreme Court's decision in <u>Potawatomi</u>, which held that filing a suit for injunctive relief against a state tax commission in federal court did not waive an Indian tribe's immunity from the tax commission's counterclaims.  498 U.S. at 509-10 ("We uphold the Court of Appeals' determination that the Tribe did not waive its sovereign immunity merely by filing an action for injunctive relief.").  It is clear that the Indian tribe had voluntarily invoked the jurisdiction of the federal courts, yet did not waive its sovereign immunity against related counterclaims by doing so.  Notably, the Supreme Court in <u>Lapides</u> expressly distinguished <u>Potawatomi</u> and other cases cited by the state of Georgia, recognizing that tribal immunity implicates wholly different concerns than are raised by Eleventh Amendment immunity:

> Those cases, however, do not involve the Eleventh Amendment -- a specific text with a history that focuses upon the State's sovereignty vis-á-vis the Federal Government. And each case involves special

18

circumstances not at issue here, for example, an effort by a sovereign (i.e., the United States) to seek the protection of its own courts (i.e., the federal courts), <u>or an effort to protect an Indian tribe</u>.

<u>Lapides</u>, 535 U.S. at 623 (emphasis added).  The Supreme Court squarely recognized that waiver rules applicable to states may not apply in the same way to Indian tribes.

We are, therefore, reluctant to extend the Supreme Court's decision in <u>Lapides</u>, which, after all, raised questions about a state's removal of a claim in the context of Eleventh Amendment immunity, to the substantially different context presented by this case.   In short, the Tribe's removal of the case to federal court did not, standing alone, waive the Tribe's sovereign immunity from suit.

**B.**

Contour also claims that the Indian Civil Rights Act of 1968 ("ICRA"), 25 U.S.C. §§ 1301-1303, creates an implicit cause of action that allows Contour to sue the Seminole Tribe.  In particular, Contour says that it should be permitted to sue the Tribe for violations of 25 U.S.C § 1302(a)(5) and (a)(8), which provide: "No Indian tribe in exercising powers of self-government shall . . . take any private property for a public use without just compensation . . . [or] deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law."  The trouble with this argument is

19

that it is foreclosed by Supreme Court precedent establishing that the Tribe is immune from just such a suit. See Santa Clara Pueblo v. Martinez, 436 U.S. 49 (1978). Santa Clara Pueblo involved an internal tribal dispute, in which a tribal member and her daughter sued the tribe and its Governor under the ICRA "seeking declaratory and injunctive relief against enforcement of a tribal ordinance denying membership in the tribe to children of female members who marry outside the tribe, while extending membership to children of male members who marry outside the tribe." Id. at 51. The entirety of the pertinent tribal immunity holding from Santa Clara Pueblo is as follows:

> It is settled that a [congressional] waiver of sovereign immunity "'cannot be implied but must be unequivocally expressed.'" Nothing on the face of Title I of the ICRA purports to subject tribes to the jurisdiction of the federal courts in civil actions for injunctive or declaratory relief. Moreover, since the respondent in a habeas corpus action is the individual custodian of the prisoner, the provisions of [25 U.S.C.] § 1303 [expressly providing for federal habeas corpus jurisdiction to contest the legality of a tribal detention] can hardly be read as a general waiver of the tribe's sovereign immunity. In the absence here of any unequivocal expression of contrary legislative intent, we conclude that suits against the tribe under the ICRA are barred by its sovereign immunity from suit.

Id. at 58-59 (emphasis added) (citations omitted). Contour's argument does not even address the Supreme Court's straightforward tribal immunity holding.

Contour instead relies upon an opinion from the Tenth Circuit holding that

20

the Indian Civil Rights Act creates an implied cause of action, at least where the following narrow circumstances are met: (1) the involvement of a non-Indian in the suit; (2) an attempt by the plaintiff to seek a remedy in a tribal forum; and (3) the unavailability of an adequate tribal remedy. Dry Creek Lodge, Inc. v. Arapahoe & Shoshone Tribes, 623 F.2d 682, 685 (10th Cir. 1980). Although the district court in this case examined whether Contour met the factors enumerated by the Tenth Circuit in Dry Creek before declining to find an implied cause of action, it need not have gone that far. As we see it, the Tenth Circuit's framework is unnecessary when tribal immunity is at issue. The law is crystal clear that tribal immunity applies unless there has been congressional abrogation or waiver by the tribe. Kiowa Tribe, 523 U.S. at 754. The problem with Contour's claim is that congressional abrogation must be unequivocally expressed and the Supreme Court has already held that "suits against the tribe under the ICRA are barred by its sovereign immunity from suit." Santa Clara Pueblo, 436 U.S. at 59.[4] The very

---

[4] As far as tribal immunity and the ICRA are concerned, the entire holding of the Supreme Court is found in the one-paragraph explanation that congressional abrogation of sovereign immunity must be unequivocally expressed and that the ICRA does not expressly abrogate tribes' immunity from suit. Santa Clara Pueblo, 436 U.S. at 58-59. That was the beginning and the end of the relevant analysis. The Supreme Court in Santa Clara Pueblo also had occasion to address whether there was an implied cause of action under the ICRA, but only because one of the tribal officers was sued individually and was not protected by the tribe's immunity from suit under the principles of Ex Parte Young, 209 U.S. 123 (1908). See 436 U.S. at 59. It was only because of this distinction that the Supreme Court had to "determine whether the cause of action for declaratory and injunctive relief asserted here by respondents, though not

21

notion of an <u>implied</u> cause of action against an Indian tribe protected by sovereign immunity is at war with the requirement that Congress must <u>expressly</u> abrogate the tribe's immunity.  The Indian Civil Rights Act provides no basis to subject the Seminole Tribe to the instant suit.

## C.

Contour's final argument is that the Seminole Tribe's misrepresentations about the status of the lease -- that the lease was "fully executed," that "all paperwork needed for the Lease had been submitted and approved," and that Contour's owner was "good to go" -- should prevent the Tribe from disclaiming its express waiver of sovereign immunity contained in the concededly invalid lease agreement.  Contour claims that "equitable estoppel principles should apply to 25

expressly authorized by the [ICRA], is nonetheless implicit in its terms."  <u>Id.</u>; <u>see also</u> <u>id.</u> at 73 n.2 (White, J., dissenting) ("Because the ICRA is silent on the question, I agree with the Court that the Act does not constitute a [congressional] waiver of the Pueblo's sovereign immunity. The relief respondents seek, however, is available against petitioner Lucario Padilla, the Governor of the Pueblo.").

Although one of the tribal defendants, Chairman Cypress, is an individual officer of the Tribe, the district court held that the <u>Ex Parte Young</u> doctrine did not apply to Chairman Cypress because he was acting in his official capacity and within the scope of his authority during the course of conduct alleged in Contour's complaint.  <u>See</u> <u>Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Fla.</u>, 177 F.3d 1212, 1225 (11th Cir. 1999) ("[T]ribal officers are protected by tribal sovereign immunity when they act in their official capacity and within the scope of their authority; however, they are subject to suit under the doctrine of <u>Ex Parte Young</u> when they act beyond their authority.").  This holding has not been challenged by Contour on appeal.  We, therefore, have no occasion to revisit the issue of whether Chairman Cypress is protected by the Tribe's immunity from suit.

U.S.C. § 81 agreements that require approval of contracts 'that encumber Indian lands for a period of 7 or more years' because if they do not, the principles and purposes of equitable estoppel are rendered meaningless." We remain unpersuaded.

Contour has provided us with no support for its claim that the Seminole Tribe is somehow estopped from asserting the invalidity of the lease agreement in its entirety. Indeed, Contour's own brief concedes that because "the Secretary of Interior did not approve the long term lease contract . . . . the waiver of sovereign immunity contained in that lease is not binding." We are, therefore, unpersuaded by Contour's equitable estoppel argument, and join our sister circuits that have addressed similar arguments in holding that estoppel cannot compel enforcement of any of a contract's provisions when the contract is rendered legally invalid by operation of federal law. See United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc., 883 F.2d 886, 890 (10th Cir. 1989); A.K. Mgmt. Co. v. San Manuel Band of Mission Indians, 789 F.2d 785, 789 (9th Cir. 1986).

The Ninth Circuit's decision in A.K. Management is instructive. That court considered a contract between a non-tribal party ("AK") and an Indian tribe ("the Band") that "gave AK the exclusive right to construct a bingo facility and operate

23

bingo games on the Band's reservation for twenty years." 789 F.2d at 786. The agreement included provisions obliging the Band to act in good faith and to take all necessary steps to execute the agreement. Id. The agreement also included provisions expressly waiving the Band's sovereign immunity as to any action to enforce or interpret the agreement, and incorporating the statutory and regulatory requirements that the contract receive approval from the Bureau of Indian Affairs. Id. Nonetheless, three days after signing the agreement, the tribe notified AK that it would not recognize the agreement it had just signed. Id. Just as in this case, it was undisputed that the agreement was never approved by the BIA. Id. Unlike this case, however, the Band never even attempted to obtain BIA approval. See id.

After first arguing that 25 U.S.C. § 81 did not apply to the agreement at all, "AK assert[ed] that even if section 81 applies to the Agreement," the Band was "nonetheless obligated under general contract principles to seek BIA approval of the Agreement" under "both an express and implied duty of good faith and fair dealing." Id. at 788. AK also argued that the Band could not be allowed to escape liability under the contract through the Band's own failure to seek BIA approval. Id. at 789.

The Ninth Circuit rejected this line of argument because it could not be squared with the language of the statute:

24

> Whatever the persuasive force of these arguments, it is doubtful that general contract principles apply to an agreement subject to 25 U.S.C. § 81 (1982). Section 81 explicitly provides that a contract is "null and void" without written approval from the BIA. Therefore it is logical to conclude that an agreement without BIA approval must be null and void in its entirety. No part of it may be enforced or relied upon unless and until BIA approval is given. BIA approval is an absolute prerequisite to the enforceability of the contract. To give piecemeal effect to a contract as urged by AK, would hobble the statute. The plain words of section 81 simply render this contract void in the absence of BIA approval. Since it is void, it cannot be relied upon to give rise to <u>any</u> obligation by the Band, including an obligation of good faith and fair dealing. Accordingly, we find that general contract principles do not impose a duty on the Band to seek BIA approval of the Agreement.

Id. (footnote omitted).[5] The Ninth Circuit's tribal immunity analysis was then straightforward. The court observed that "the waiver of sovereign immunity is clearly part of the Agreement, and is not operable except as part of that Agreement." Id. It concluded that "[s]ince the entire contract is inoperable without BIA approval, the waiver is inoperable and, therefore, the tribe remains immune from suit." Id.

The Tenth Circuit in Potawatomi reached the same conclusion, explicitly following the Ninth Circuit's approach. The Tenth Circuit rejected the non-tribal

---

[5] The Ninth Circuit was interpreting a previous version of section 81 that used the term "null and void" to describe contracts lacking Secretarial approval. 25 U.S.C. § 81 (1982). Since the year 2000, the statute has provided: "No agreement or contract with an Indian tribe that encumbers Indian lands for a period of 7 or more years shall be <u>valid</u> unless that agreement or contract bears the approval of the Secretary of the Interior or a designee of the Secretary." 25 U.S.C. § 81(b) (emphasis added). For purposes of this appeal, however, we are hard pressed to see a relevant difference between a legally invalid contract and a null and void one.

party's assertion that the Indian tribe's "particularly egregious conduct" supported the claim "that the Tribe is estopped from asserting the protection of section 81." 883 F.2d at 890. The court noted that "similar claims of estoppel based on similar circumstances have been considered in the context of section 81 and rejected." Id. (citing A.K. Mgmt., 789 F.2d at 788-89).

The reasoning behind these decisions is persuasive. The straightforward text of 25 U.S.C. § 81 makes plain that a contract governed by this statute is invalid until the Secretary has approved it. 25 U.S.C. § 81(b) ("No agreement or contract with an Indian tribe that encumbers Indian lands for a period of 7 or more years shall be valid unless that agreement or contract bears the approval of the Secretary of the Interior or a designee of the Secretary."). The piecemeal enforcement of various provisions of an indisputably invalid lease agreement -- such as the Tribe's waiver of sovereign immunity -- would squarely conflict with the text of the statute. We add that if it seems as if the approval requirement embodied in 25 U.S.C. § 81 is entirely one-sided, giving all the benefit to the Indian tribe and placing all of the risk on the non-tribal party, that is because the statute was designed that way. "Section 81 was enacted in 1872 'to protect the Indians from improvident and unconscionable contracts.'" Wis. Winnebago Bus. Comm. v. Koberstein, 762 F.2d 613, 617 (7th Cir. 1985) (quoting In re Sanborn,

26

148 U.S. 222, 227 (1893)); see also H.R. Rep. No. 106-501, at 1-2 (2000), reprinted in 2000 U.S.C.C.A.N. 69, 69 ("Section 81 of Title 25 of the United States Code, enacted in 1872, is intended to protect Indians from improvident contracts and is concerned primarily with federal control over contracts between Indians [sic] tribes or individual Indians and non-Indians."). While the statute has been amended over the years to reduce federal control, most recently in 2000 to limit its scope to long-term contracts that encumber Indian lands for seven or more years, there is no dispute that it unambiguously applies to the long-term lease at issue in this case.

The Secretary's approval is a condition precedent to the validity of any lease covered by 25 U.S.C. § 81. Contour does not dispute this basic legal reality. However misleading the alleged conduct of the Seminole Tribe may have been, there is no legal support for Contour's claim that equitable principles can somehow resurrect an Indian tribe's waiver of sovereign immunity from the graveyard of a concededly invalid lease agreement. This claim too provides no basis for subjecting the Seminole Tribe to suit.

Accordingly, we affirm the judgment of the district court dismissing Contour's federal claims for lack of jurisdiction and remanding the state-law claims back to state court.

**AFFIRMED**.